## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| BEREL ROSENFELD IRA and LEAH ROSENFELD IRA, | Case No.: |
| Plaintiffs, | |
| vs. | **VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT** |
| JAMES D. FARLEY, JR., KIMBERLY A. CASIANO, ALEXANDRA FORD ENGLISH, HENRY FORD III, WILLIAM CLAY FORD, JR., WILLIAM W. HELMAN IV, JON M. HUNTSMAN, JR., WILLIAM E. KENNARD, JOHN C. MAY, BETH E. MOONEY, LYNN VOJVODICH RADAKOVICH, JOHN L. THORNTON, JOHN B. VEIHMEYER, JOHN S. WEINBERG, and JOHN T. LAWLER, | **JURY DEMAND** |
| Defendants, | |
| and | |
| FORD MOTOR COMPANY, | |
| Nominal Defendant. | |

Plaintiffs, Berel Rosenfeld IRA and Leah Rosenfeld IRA, by their undersigned attorneys, brings this stockholder derivative action on behalf of nominal defendant Ford Motor Company ("Ford" or the "Company") against current members of the Company's Board of Directors (the "Board") (the "Individual

Defendants") for their breaches of fiduciary duties, violations of the federal securities laws, and other misconduct that resulted in material damage to the Company and its stockholders.   These allegations are made upon personal knowledge with respect to Plaintiffs and, as to all other matters, upon information and belief based upon the investigation and analysis by Plaintiffs' counsel, including, among other things, a review of the Company's press releases and public filings with the United States Securities and Exchange Commission ("SEC"), corporate governance documents published on the Company's website, news reports, financial analyst reports, and other publicly available information about the Company.  Plaintiffs believe that substantial additional evidentiary support will exist for the allegations after a reasonable opportunity for discovery.

## I.      NATURE OF THE ACTION

1.      This is a stockholder derivative action brought by Plaintiffs on behalf of nominal defendant Ford against its current Board for their breaches of fiduciary duty and violations of the federal securities laws that resulted in material damage to the Company and its stockholders.

2.      Ford is a prominent U.S.-based automaker, ranking as the second-largest in the United States and the sixth-largest globally. The company went public in 1956 but is controlled by the Ford family through their ownership of special Class

2

B shares, granting them over 40% of Ford's voting rights.[1] In 2023, Ford manufactured approximately 4.4 million automobiles, and employed a global workforce of about 177,000.

3.      The Company has consistently stated in its public filings that its internal controls over financial reporting, operational performance, and regulatory compliance were adequate and that its financial statements were truthful, accurate, and complete. However, these statements were proven false as the Company's financial statements were rife with material misstatements and omissions due to the Individual Defendants' utter failure to maintain an effective system of internal controls.

4.      Ford has led the industry in recalls since 2021, with 62 recalls in 2024 alone. Indeed, on July 24, 2024, Ford disclosed that warranty and recall costs were escalating out of control surging to $2.3 billion, marking an $800 million increase from the first quarter of 2024. This equates to approximately $25.5 million per day spent on addressing warranty claims and recalls.

---

[1] Ford's Class B stock is not publicly traded, is held in trust by members of the Ford family for the benefit of members of the Ford family, and accounts for approximately 40% of the Company's overall voting power, with the precise number of votes for each share of Class B Stock calculated each year in accordance with the Company's Restated Certificate of Incorporation. Class B shareholders do not have the right to elect any directors separately from common shareholders.

5.     These rising costs have severely impacted Ford's profitability and financial performance, leading to $2.8 billion drop in operating profit, a 26% decline from $3.8 billion in the second quarter of 2023, and significantly below Wall Street's expectations of $3.7 billion.

6.     Defendant John T. Lawler ("Lawler"), the Company's Vice Chairman and CFO, acknowledged the issues stating that Ford had "lots of work ahead of us to raise quality and reduce costs and complexity." In fact, the Company's CEO, Defendant James D. Farley, Jr. ("Farley"), went even further and admitted that Ford's ballooning warranty problems stemmed from the size of "new technology in our vehicles. And that new technology is difficult for the dealers to diagnose when customers come in and say something is wrong" . . . which in turn "hits our warranty reserves." These issues prompted a leadership change in December 2024 with Ford announcing that a new "head of quality" would be appointed.

7.     Finally, on November 13, 2024, Ford agreed to a consent order with the National Highway Traffic Safety Administration ("NHTSA") after a federal investigation found that Ford moved too slowly to recall vehicles with faulty rearview cameras and failed to provide accurate and complete recall information, as required by the National Traffic and Motor Vehicle Safety Act (the "Safety Act"). As part of the consent order, Ford agreed to pay up to $165 million in civil penalties - the second-largest penalty in NHTSA history. Under the order, an independent

third-party monitor will oversee the automaker's recall performance obligations for at least three years.

8.      The failure to implement adequate internal policies and procedures to ensure adequate and proper accounting for warranty and recall costs and obligations, as well as compliance with Ford's obligations under federal law, rendered the Company's previously reported financial results materially false and misleading. This utter lack of oversight and effective internal controls undermined the reliability of the Company's financial disclosures, misrepresenting rising warranty and recall costs, and violations of federal laws, ultimately causing substantial harm to the Company, its shareholders, and its reputation, further eroding investor confidence and raising questions about the Company's operational governance.

9.      Ford's stock price dropped precipitously in the wake of these shocking disclosures, leading to the filing of securities class action lawsuits against the Company and Defendants Farley and Lawler. The Company is now subject to substantial liability and will be forced to expend substantial sums to defend itself and its officers and/or directors. Notably, the impact of these actions was not borne equally by all stockholders. During the time that Ford's stock price was artificially inflated due to false statements and material omissions, Defendants Farley, Huntsman, and Lawler (the "Insider Seller Defendants") sold substantial amounts of

their Ford shareholdings, collectively selling 376,319 Ford shares, and reaping more than $5.7 million in unlawful proceeds.

10.     Furthermore, during the period when Ford's stock price was artificially inflated due to the false and misleading statements and material omissions about the Company's financial condition and business prospects, the Individual Defendants, in breach of their fiduciary duties, caused Ford to repurchase almost 55 million shares of its commons stock at inflated prices for over $700 million.

11.     As a result of the Individual Defendants' breaches of fiduciary duty, Ford has sustained significant damages and irreparable harm to its reputation. These failures in oversight and governance have not only impacted the company's financial standing but have also undermined shareholder trust. Through this action, Plaintiffs seek to recover for the Company the damages it incurred and to remediate the control weaknesses that continue to affect Ford's operations and corporate governance practices and procedures.

12.     Plaintiffs did not make a demand prior to bringing this action because it would be futile.  The Company's directors are neither disinterested nor independent. All of the directors are beholden to Defendants Alexandra Ford English ("English"), William Clay Ford, Jr. ("Bill Ford"), and Henry Ford III ("Henry Ford"), who are all family of the original founder of the Company, controlling shareholders of Ford, and who are engaged in related party transactions with the Company that the board

of directors has approved. Absent this action, Ford will neither recover its damages nor properly remediate the weaknesses in its internal controls and corporate governance practices and procedures.

## II.   JURISDICTION AND VENUE

13.   This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Sections 10(b) and 14(a) (15 U.S.C. §§ 78j(b) and 78n(a)) of the Securities Exchange Act of 1934 (the "Exchange Act"), SEC Rule 14a-9 (17 C.F.R. § 240.14a-9) promulgated thereunder, and for contribution pursuant to Section 21D of the Exchange Act.

14.   This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367(a).

15.   Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b), because a substantial portion of the transactions and wrongs complained of herein occurred in this District where Ford maintains its principal executive offices and Defendants have received substantial compensation within this District by doing business here and engaging in numerous activities that have had an effect in this jurisdiction.

## III.   INDIVIDUAL DEFENDANTS' DUTIES

16.   By reason of their positions as officers and/or directors of the Company, and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed and owe the Company and its

shareholders fiduciary obligations of loyalty, good faith, due care, and candor, and were and are required to use their utmost ability to control, manage, and oversee the Company in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of the Company and its shareholders to benefit all shareholders equally and not in furtherance of their own personal interests or benefit.

17.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of Ford, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein. Because of their advisory, executive, managerial, and directorial positions with Ford, each of the Individual Defendants knew material, non-public information pertinent to the Company.

18.    As senior executive officers and directors of a publicly traded company whose common stock was registered with the SEC and traded on the NYSE, the Individual Defendants also owed a duty to ensure the dissemination of accurate, complete, and truthful information concerning Ford's financial condition, operations, products, internal controls, and business prospects.  In addition, the Individual Defendants had a duty to cause the Company to disclose in its regulatory filings with the SEC all material facts so that the market price of the Company's shares would be based upon accurate information.  In order to meet these duties, the

Individual Defendants were required to exercise reasonable control and supervision over Ford's management, policies, and internal controls.

19.    Each of the Individual Defendants also owed to the Company and its shareholders the duty of loyalty requiring that they prioritize Ford's interest and that of its shareholders over their own interests and refrain from using their position, influence, or insider knowledge of the affairs of the Company to gain personal advantage.

20.    At all times relevant hereto, the Individual Defendants were the agents of each other and Ford and were always acting within the course and scope of such agency.

21.    The Individual Defendants were and are also subject to particularized duties pursuant to specific policies in effect at Ford.

**A.    Additional Duties Under The Corporate Governance Principles**

22.    The Company's Corporate Governance Principles lay out the responsibilities of the Board, which include, inter alia:

- review, approve and monitor fundamental financial and business strategies and major Company actions;

- review and discuss reports by management on the performance of the Company, its plans, products and prospects;

- assess major risks facing the Company -- and review and approve strategies for addressing such risks; and

- ensure processes are in place for maintaining the integrity and reputation of the Company --- the integrity of the financial statements, compliance with law and Company policy, the integrity of relationships with customers and suppliers, and the integrity of relationships with other Company stakeholders.

23.   The Company's Corporate Governance Principles also provide that Ford's directors and officers act ethically and should avoid any conflicts of interest, stating:

> The Board expects Ford directors, as well as officers and employees, to act ethically at all times and in accordance with applicable Company codes of ethics. If an actual or potential conflict of interest arises for a director, the director shall promptly inform the Chair and the Lead Independent Director. If a significant conflict exists and cannot be resolved, the director should resign. All directors will recuse themselves from any discussion or decision affecting their personal, business or professional interests. The Board shall resolve any conflict of interest question involving the Chair, or a Board member, and the Board or a designated committee thereof comprised of independent directors shall resolve any conflict of interest question involving any other officer of the Company.

## B.   Additional Duties Under The Code Of Business Conduct And Ethics

24.   Ford's Code of Business Conduct and Ethics for Members of the Board of Directors (the "Code of Conduct") was adopted by the Board and contains "guidance to directors to help them recognize and deal with ethical issues" and "to foster a culture of honesty and accountability." The Code of Conduct applies to all directors.

25.   In relevant part, the Code of Conduct provides further that:

- Directors must avoid any conflicts of interest between the director and the Company. Any situation that involves, or may reasonably be expected to involve, a conflict of interest with the Company should be disclosed promptly to the Chair of the Board of Directors, the Chair of the Nominating and Governance Committee, or the Presiding Director.

- Directors are prohibited from: (a) taking for themselves personally opportunities related to the Company's business; (b) using the Company's property, information, or position for personal gain; or (c) competing with the Company for business opportunities, provided, however, if the Company's disinterested directors determine that the Company will not pursue an opportunity that relates to the Company's business, a director may do so.

- Directors should maintain the confidentiality of information entrusted to them by the Company and any other confidential information about the Company that comes to them, from whatever source, in their capacity as a director, except when disclosure is authorized or legally mandated. For purposes of this Code, "confidential information" includes all non-public information relating to the Company.

- Directors shall comply, and satisfy themselves that appropriate policies and procedures are in place for compliance by employees, officers and other directors, with laws, rules and regulations applicable to the Company, including insider trading laws. Transactions in Company securities are governed by the Company's policies with respect to trading such securities and transactions in Company securities should be reviewed in advance with the Secretary's Office.

- Directors shall satisfy themselves that appropriate policies and procedures are in place for fair dealing by employees and officers with the Company's customers, suppliers, competitors and employees.

- Any suspected violations of this Code should be reported promptly to the Chair of the Board of Directors, the Chair of the Nominating and Governance Committee or the Lead

Independent Director. Violations will be investigated by the Board or by a person or persons designated by the Board and appropriate action will be taken in the event of any violations of the Code. Any waiver of this Code occurring subsequent to its effective date may be made only by the Board or the Nominating and Governance Committee and any such waiver will be promptly posted to the Company's public website.

26.   The Company also maintains a Code of Conduct for Senior Financial Personnel which requires honest and ethical conduct of the Vice Chairman and CFO, among others. More specifically, the Code of Conduct for Senior Financial Personnel requires the Company's senior financial personnel to:

- ensure that external and internal financial data, and other information contained in our public reports, are complete, accurate, timely, understandable, and present the facts fairly;

- uphold honest and ethical conduct, especially in relation to the handling of actual and apparent conflicts of interest. These conflicts may arise from any transaction between the Company (or other companies with which the Company does business) and an employee that is not part of a program generally available to all employees or a Human Resources-approved program;

- report any conflict of interest (actual or apparent), any violation or suspected violation of this code of ethics, or any unusual event; and

- ensure the Company is in full compliance with the law, all applicable rules and regulations, and Company policy, both in letter and in spirit.

## C.     Additional Duties Of The Members Of The Audit Committee

27.     The members of the Company's Audit Committee have additional duties outlined in the Audit Committee Charter, including requirements that its members assist the Board in its oversight of:

- The reliability and integrity of the Company's accounting policies and financial reporting and disclosure practices;

- The establishment and maintenance of processes to assure compliance with all relevant laws, regulations, and Company policy, including a process for receipt of complaints and concerns regarding management fraud and accounting, internal control or auditing matters;

- The independent auditor's qualifications and independence; and o The performance of the Company's internal audit function and independent auditor;

- Preparation of the report of the Audit Committee to be included in the Company's annual proxy statement;

- Review and discuss with management and the independent auditor the annual and quarterly financial statements prior to their filing, including the Company's disclosure under "Management's Discussion and Analysis of Financial Condition and Results of Operations" and a discussion with the independent auditor of the matters required to be communicated by applicable Statements of Auditing Standards;

- Discuss generally the Company's philosophy and processes associated with earnings press releases and financial information and earnings guidance provided to analysts and rating agencies;

- Review with the independent auditor all critical accounting policies and practices to be used; all alternative treatments of financial information within generally accepted accounting principles ("GAAP") that have been discussed with management, ramifications of the use of such alternative

13

disclosures and treatments, and the treatment preferred by the independent auditor; and other material written communications between the independent auditor and management, such as any management letter or schedule of unadjusted differences;

- In consultation with the independent auditor and the internal auditor, review the integrity of the financial reporting processes, both internal and external;

- Review, with the Company's Disclosure Committee: (i) the Company's disclosure controls and procedures; (ii) any significant deficiencies in the design or operation of internal controls of the Company which could adversely affect the Company's ability to record, process, summarize and report financial data; and (iii) any fraud, material or otherwise, that involves management or other employees who have a significant role in the Company's internal controls;

- Review, with the Office of the General Counsel, any legal or regulatory matter that could have a significant impact on the financial statements;

- Ensure management has a proper review system in place to ensure that financial statements, reports, and other financial information disseminated to governmental organizations and the public satisfy legal requirements;

- Establish a code of ethics for the senior financial personnel of the Company in accordance with applicable law, rules and regulations;

- Review and discuss with management, the independent auditor, and the General Auditor: (a) the adequacy and effectiveness of the Company's internal controls over financial reporting (including any significant deficiencies or material weaknesses therein and any significant or material changes thereto); (b) management's assessment of the effectiveness of its internal controls and the basis therefor; (c) the independent auditor's attestation of management's assessment, and its audit of the Company's internal controls over financial reporting; (d) the Company's internal audit function and procedures; and (e) the

adequacy and effectiveness of the Company's disclosure controls and procedures, and management's evaluation thereof; and

- Exercise reasonable oversight with respect to the implementation and effectiveness of the Company's compliance and ethics program, including being knowledgeable about the content and operation of such compliance and ethics program.

**D.    Additional Duties Of The Members Of The Nominating And Governance Committee of the Board of Directors**

28.    The members of the Company's Nominating and Governance Committee have additional duties outlined in the Nominating and Governance Committee Charter, including requirements that its members:

- Develop and recommend to the Board a set of corporate governance principles applicable to the Company;

- Evaluate, monitor and make recommendations to the Board with respect to the corporate governance policies and procedures of the Company;

- At least annually, and as circumstances otherwise dictate, oversee evaluation of the Board of Directors;

- Periodically review the charter and composition of each committee of the Board and make recommendations to the Board for the adoption of or revisions to the committee charters, the creation of additional committees or the elimination of Board committees;

- Consider the adequacy of the By-Laws and Certificate of Incorporation of the Company and recommend to the Board, as conditions dictate, that it adopt amendments to the By-Laws and that it propose amendments to the Certificate of Incorporation for consideration by the shareholders;

- Develop and recommend to the Board a set of corporate governance principles and guidelines and keep abreast of

developments with regard to corporate governance to enable the Nominating and Governance Committee to make recommendations to the Board in light of such developments as may be appropriate;

- Review management's monitoring of compliance with the Company's Standards of Corporate Conduct, consider any requests for waivers of the Company's codes of ethics by directors or executive officers and review any proposed transactions between the Company and its directors or executive officers; and

- Prepare an annual report on corporate governance matters for inclusion in the proxy statement.

## IV.    PARTIES

### A.    Plaintiffs

29.    Plaintiffs Berel Rosenfeld IRA and Leah Rosenfeld IRA have been shareholders of Ford since at least November 2021 and have held Ford common stock continuously since that time. As such, Plaintiffs were shareholders at the time of the transactions complained of herein.

### B.    Defendants

#### 1.    Nominal Defendant Ford Motor Company

30.    Nominal Defendant Ford is incorporated under Delaware Law with its principal executive offices at One American Road, Dearborn, Michigan 48126. The Company's common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "F".

### 2. Individual Defendants

#### a. Defendant Farley

31.    Defendant Farley is President and CEO of Ford and a Ford director since October 2020, as well as President of Ford Model e since March 2022. Farley was also the Chief Operating Officer of Ford from February 2020 until October 2020. Since 2021, Farley received the following compensation:

| YEAR | SALARY | STOCK AWARDS | NON-EQUTIY INCENTIVE PLAN COMPENSATION | ALL OTHER COMPENSATION | TOTAL |
|---|---|---|---|---|---|
| 2023 | $1,700,000 | $20,329,795 | $2,399,040 | $2,041,198 | $26,470,033 |
| 2022 | $1,700,000 | $15,145,381 | $2,754,000 | $1,396,765 | $20,996,146 |
| 2021 | $1,700,000 | $16,078,486 | $3,672,000 | $1,362,688 | $22,813,174 |

#### b. Defendant Casiano

32.    Defendant Kimberly A. Casiano ("Casiano") has been a Ford director since 2003 and is a member of the Audit Committee, the Nominating and Governance Committee, and the Sustainability, Innovation and Policy Committee. Since 2021, Casiano received the following compensation:

| YEAR | FEES EARNED OR PAID IN CASH | STOCK AWARDS | ALL OTHER COMPENSATION | TOTAL |
|---|---|---|---|---|
| 2023 | $100,000 | $214,991 | $16,450 | $331,441 |
| 2022 | $100,000 | $214,993 | $35,352 | $350,345 |
| 2021 | $100,000 | $214,990 | $50,245 | $365,236 |

### c.  Defendant English

33.  Defendant English has been a Ford director since May 2021 and is a member of the Finance Committee and the Sustainability, Innovation and Policy Committee. Since 2021, English received the following compensation:

| YEAR | FEES EARNED OR PAID IN CASH | STOCK AWARDS | ALL OTHER COMPENSATION | TOTAL |
|---|---|---|---|---|
| 2023 | N/A | $314,990 | $68,720 | $383,710 |
| 2022 | $50,000 | $107,487 | $360,437 | $ 517,924 |
| 2021 | N/A | N/A | $571,701 | $571,701 |

### d.  Defendant Henry Ford

34.  Defendant Henry Ford has been a Ford director since May 2021 and is a member of the Finance Committee and the Sustainability, Innovation and Policy Committee. Since 2021, Henry Ford received the following compensation:

| YEAR | FEES EARNED OR PAID IN CASH | STOCK AWARDS | ALL OTHER COMPENSATION | TOTAL |
|------|------|------|------|------|
| 2023 | $100,000 | $214,991 | $54,463 | $369,454 |
| 2022 | $100,000 | $214,993 | $51,988 | $366,981 |
| 2021 | $50,000 | $107,497 | $173,904 | $331,401 |

**e.    Defendant Bill Ford**

35.    Defendant Bill Ford has been a Ford director since 1988, Chair of the Board since 1999, and Executive Chair of the Board since September 2006. Bill Ford is Chair of the  Finance Committee, and a member of the Sustainability, Innovation and Policy Committee, and was the Company's CEO from October 2001 to September 2006. Since 2021, Bill Ford received the following compensation:

| YEAR | SALARY | STOCK AWARDS | NON-EQUTIY INCENTIVE PLAN COMPENSATION | ALL OTHER COMPENSATION | TOTAL |
|------|------|------|------|------|------|
| 2023 | $1,700,000 | $15,848,199 | $705,600 | $2,203,425 | $20,613,100 |
| 2022 | $1,700,000 | $12,847,472 | $810,000 | $1,944,794 | $17,302,266 |
| 2021 | $1,700,000 | $13,785,209 | $1.080,000 | $2,094,497 | $18,662,706 |

**f.    Defendant Helman**

36.    Defendant William W. Helman IV ("Helman") has been a Ford director since 2011, is Chair of the Sustainability, Innovation and Policy Committee and a

member of the Finance Committee and the Nominating and Governance Committee. Since 2021, Helman received the following compensation:

| YEAR | FEES EARNED OR PAID IN CASH | STOCK AWARDS | ALL OTHER COMPENSATION | TOTAL |
|---|---|---|---|---|
| 2023 | $120,000 | $214,991 | $18,866 | $353,857 |
| 2022 | $120,000 | $214,993 | $ 4,861 | $339,855 |
| 2021 | $120,000 | $214,990 | $715 | $335,705 |

### g.    Defendant Huntsman

37.    Defendant Jon M. Huntsman, Jr. ("Huntsman") has been a Ford director since 2020 and is a member of the Sustainability, Innovation and Policy Committee. Huntsman was also a Ford director from 2012 to 2017, and was the Vice Chair, Policy from May 2021 to December 2022. Since 2021, Huntsman received the following compensation:

| YEAR | FEES EARNED OR PAID IN CASH | STOCK AWARDS | ALL OTHER COMPENSATION | TOTAL |
|---|---|---|---|---|
| 2023 | $100,000 | $214,991 | $74,497 | $389,488 |
| 2022 | N/A | N/A | N/A | N/A |
| 2021 | $41,667 | $89,578 | $3,778,523 | $3,909,768 |

### h. Defendant Kennard

38.  Defendant William E. Kennard ("Kennard") has been a Ford director since 2015 and is Chair of the Nominating and Governance Committee and a member of the Finance Committee and the Sustainability, Innovation and Policy Committee. Since 2021, Kennard received the following compensation:

| YEAR | FEES EARNED OR PAID IN CASH | STOCK AWARDS | ALL OTHER COMPENSATION | TOTAL |
|---|---|---|---|---|
| 2023 | $120,000 | $214,991 | $62,956 | $397,947 |
| 2022 | $120,000 | $214,993 | $ 59,778 | $394,772 |
| 2021 | $120,000 | $214,990 | $59,085 | $394,075 |

### i. Defendant May

39.  Defendant John C. May ("May") has been a Ford director since December 2021 and is a member of the Compensation, Talent and Culture Committee, the Finance Committee, and the Nominating and Governance Committee. Since 2021, May received the following compensation:

| YEAR | FEES EARNED OR PAID IN CASH | STOCK AWARDS | ALL OTHER COMPENSATION | TOTAL |
|---|---|---|---|---|
| 2023 | N/A | $314,990 | $33,514 | $348,504 |
| 2022 | $100,000 | $214,993 | $ 2,046 | $317,039 |
| 2021 | $8,333 | $17,904 | $21 | $26,258 |

### j.      Defendant Mooney

40.   Defendant Beth E. Mooney ("Mooney") has been a Ford director since 2019 and is a member of the Company's Audit Committee and the Nominating and Governance Committee. Since 2021, Mooney received the following compensation:

| YEAR | FEES EARNED OR PAID IN CASH | STOCK AWARDS | ALL OTHER COMPENSATION | TOTAL |
|---|---|---|---|---|
| 2023 | $100,000 | $214,991 | $38,352 | $353,342 |
| 2022 | $100,000 | $214,993 | $37,144 | $352,138 |
| 2021 | $100,000 | $214,990 | $36,354 | $351,344 |

### k.      Defendant Radakovich

41.   Defendant Lynn Vojvodich Radakovich ("Radakovich") has been a Ford director since April 2017 and is Chair of the  Compensation, Talent and Culture Committee, and is a member of the Nominating and Governance Committee and the Sustainability, Innovation and Policy Committee. Since 2021, Radakovich received the following compensation:

| YEAR | FEES EARNED OR PAID IN CASH | STOCK AWARDS | ALL OTHER COMPENSATION | TOTAL |
|---|---|---|---|---|
| 2023 | $125,000 | $214,991 | $80,025 | $420,016 |
| 2022 | $114,583 | $214,993 | $77,388 | $406,964 |
| 2021 | $100,000 | $214,990 | $24,375 | $339,365 |

### l.    Defendant Thornton

42.    Defendant John L. Thornton ("Thornton") has been a Ford director since 1996. Thornton is a member of the Compensation, Talent and Culture Committee, the Finance Committee, and the Nominating and Governance Committee. Since 2021, Thornton received the following compensation:

| YEAR | FEES EARNED OR PAID IN CASH | STOCK AWARDS | ALL OTHER COMPENSAT ION | TOTAL |
|------|------|------|------|------|
| 2023 | $150,000 | $214,991 | $23,969 | $388,960 |
| 2022 | $129,167 | $214,993 | $23,313 | $367,473 |
| 2021 | $100,000 | $214,990 | $24,375 | $339,365 |

### m.    Defendant Veihmeyer

43.    Defendant John B. Veihmeyer ("Veihmeyer") has been a Ford director since December 2017 and is Chair of the Audit Committee and a member of the Nominating and Governance Committee. Since 2021, Veihmeyer received the following compensation:

| YEAR | FEES EARNED OR PAID IN CASH | STOCK AWARDS | ALL OTHER COMPENSAT ION | TOTAL |
|------|------|------|------|------|
| 2023 | N/A | $344,998 | $64,834 | $409,832 |
| 2022 | $130,000 | $214,993 | $63,004 | $407,998 |
| 2021 | $130,000 | $214,990 | $61,607 | $406,597 |

**n.      Defendant Weinberg**

44.    Defendant John S. Weinberg ("Weinberg") has been a Ford director since 2016 and is a member of the Compensation, Talent and Culture Committee, the Finance Committee, the Nominating and Governance Committee, and the Sustainability, Innovation and Policy Committee. Since 2021, Weinberg received the following compensation:

| YEAR | FEES EARNED OR PAID IN CASH | STOCK AWARDS | ALL OTHER COMPENSATION | TOTAL |
|---|---|---|---|---|
| 2023 | N/A | $314,990 | $35,404 | $350,394 |
| 2022 | $100,000 | $214,993 | $35,045 | $350,038 |
| 2021 | $100,000 | $214,990 | $34,380 | $349,371 |

**o.      Defendant Lawler**

45.    Defendant Lawler is Ford's CFO since October 2020 and was appointed to the Board as Ford's Vice Chair on June 3, 2024. Since 2021, Lawler received the following compensation:

| YEAR | SALARY | STOCK AWARDS | NON-EQUITY INCENTIVE PLAN COMP. | CHANGE IN PENSION VALUE AND NONQUALIFIED DEFERRED COMP. EARNINGS | ALL OTHER COMP. | TOTAL |
|---|---|---|---|---|---|---|
| 2023 | $1,187,250 | $5,407,923 | $1,414,350 | $1,883,255 | $138,434 | $10,031,212 |
| 2022 | $1,124,850 | $6,535,903 | $1,112,355 | $0 | $183,103 | $8,956,211 |
| 2021 | $1,014,500 | $5,035,993 | $2,001,030 | $1,256,804 | $119,998 | $9,428,325 |

46.     Defendants Farley, Casiano, English, Henry Ford, Bill Ford, Helman, Huntsman, Kennard, May, Mooney, Radakovich, Thornton, Veihmeyer, Weinberg, and Lawler are referred to herein as the "Individual Defendants."

## V.     SUBSTANTIVE ALLEGATIONS

### A.     Background

47.     Ford, the fifth largest multinational automobile company, is engaged in the design, manufacturing, marketing, and servicing of a comprehensive range of cars, trucks, sport utility vehicles, and electric vehicles. Historically, the Company categorized its operations related to the manufacture, marketing, and sale of automobiles under a single reporting structure referred to as the "Automotive segment." As of January 1, 2023, Ford adopted a new operating model and reporting structure, dividing the Automotive segment into three distinct business segments: (i)

Ford Blue, for gas-powered and hybrid vehicles; (ii) Ford Model e, for electric vehicles ("EVs") and the development of embedded software and related technologies; and (iii) Ford Pro, for vehicles and services tailored to commercial customers.

48.    As part of its operations, Ford provides warranties to its customers for the vehicles it sells. These warranties are provided for a defined period of time and/or specific mileage, which vary depending upon the type of product and geographic location of the vehicle's sale. The warranties obligate the Company to address defects that occur during the warranty period by repairing, replacing, or adjusting defective parts using factory-supplied materials or workmanship.  In addition, Ford is also responsible for costs associated with safety recalls, emission recalls, and other customer satisfaction actions.

**B.    Defendants English, Henry Ford, And Bill Ford Control The Company**

49.    According to the Company's latest Proxy Statement, filed with the SEC on March 29, 2024, Defendants English, Henry Ford, and Bill Ford have a "special interest" in the Company, "have always played an important role in the business," and their Board membership continues the "family stewardship" tradition of the Company.

50.    In particular, Defendant Bill Ford has been a Ford director since 1988, Chair of the Board since 1999, and Executive Chair of the Board since September 2006.

51.    Further, Defendants English, Henry Ford and Bill Ford are controlling shareholders of the Company. They are all direct descendants of the Company's founder and they all own, either directly or beneficially, Ford's Class B stock, which controls approximately 40% of the general voting power of the Company and is held by only four holders of record.[2] Specifically: (i) Bill Ford is the beneficial owner of 19,592,914 shares of Class B Stock or 27.65% (in addition to his ownership of 2,949,527 shares of Ford common stock and 276,200 Ford common stock units); (ii) English, Bill Ford's daughter, is the beneficial owner of 1,406,945 shares of Class B Stock or 1.99% (in addition to her ownership of 26,860 shares of Ford common stock); and (iii) Henry Ford, Bill Ford's first cousin and English's second cousin, is the beneficial owner of 1,691,807 shares of Class B Stock or 2.39% (in addition to his ownership of 20,153 shares of Ford common stock).[3]

---

[2] The cousins Edsel B. Ford II ("Edsel Ford"), Bill Ford, Benson Ford, Jr., and Alfred B. Ford are the trustees of the voting trust of perpetual duration which controls the supermajority of Class B stock. The other holders of Class B stock are Edsel Ford, Lynn F. Alandt (the daughter of Benson Ford, and David P. Larsen, as trustee of various trusts.

[3] The 2024 Proxy Statement filed with the SEC on March 29, 2024 at 20.

52.     Furthermore, as more fully set forth herein, these Ford heirs have significant conflicts of interest because they are engaged in related party transactions with the Company that the Board has approved.

53.     Hence, all of the Defendants are beholden to these controlling shareholders and cannot be independent and disinterested were a shareholder demand presented to them.

**C.     Ford Represents In Its Public Filings That Its Internal Controls Over Financial Reporting Of Warranty and Recall Costs Are Adequate**

54.     In quarterly and annual filings Ford made with the SEC between February 5, 2021 and April 25, 2024,[4] Ford repeatedly represented that it monitors its obligations for warranty costs at the time of sale using a patterned estimation model that includes historical information regarding the nature, frequency, and

---

[4] These filings include all quarterly reports during this period and the Form 10-K filed on February 5, 2021, for the year ended December 31, 2020 (the "2020 10-K"), signed by Defendants Bill Ford, Farley, Casiano,  Helman, Huntsman, Kennard, Mooney, Thornton, Veihmeyer, Radakovich, and Weinberg;  and the Forms 10-K filed on February 4, 2022, for the year ended December 31, 2021 (the "2021 10-K"), February 3, 2023, for the year ended December 31, 2022 (the "2022 10-K"), and February 7, 2024, for the year ended December 31, 2023 (the "2023 10-K"), signed by these Defendants and Defendants Henry Ford and May. Defendants Farley and Lawler, pursuant to the Sarbanes-Oxley Act of 2002, certified that these quarterly and annual reports fully complied with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934 and that the information contained therein fairly presented, in all material respects, the financial condition and results of operations of the Company.

average cost of claims for each vehicle line by model year. In that context, the Company represented in these quarterly and annual reports that it "reevaluate[s] the adequacy of our accruals [for warranty costs] on a regular basis."

55.    The Company and the Ford Board also disclosed in the 2020, 2021, 2022 and 2023 Forms 10-K that because experience dictates "that initial data for any given model year may be volatile[, Ford's] process relies on long-term historical averages until sufficient data are available. As actual experience becomes available, we use the data to update the historical averages. We then compare the resulting accruals with present spending rates to assess whether the balances are adequate to meet expected future obligations. Based on this data, we update our estimates as necessary."

56.    The Company also disclosed in these public filings that it accrues for matters when losses are "deemed probable and reasonably estimable. In evaluating matters for accrual and disclosure purposes, we take into consideration factors such as our historical experience with matters of a similar nature, the specific facts and circumstances asserted, the likelihood that we will prevail, and the severity of any potential loss. We reevaluate and update our accruals as matters progress over time."

57.    The Company further represented that it was very confident in its system of warranty accruals, proclaiming that it does not "believe there is a reasonably possible outcome materially in excess of our accrual for these matters."

58.   Given the confidence portrayed in its system of warranty accruals, in its 1Q21 10-Q (filed with the SEC on April 29, 2021), the Company reported a reduction in warranty expense accruals of $141 million in 1Q21, which correspondingly resulted in Ford's reporting a $200 million and 10.1% improvement in 1Q2021 automotive segment EBIT and EBIT margin, respectively.

59.   Similarly, in its 2Q21 10-Q (filed with the SEC on July 29, 2021), the Company reported a $2 billion and 0.4% improvement in 2Q2021 automotive segment EBIT and EBIT margin, respectively.

60.   In addition, in its 3Q21 10-Q (filed with the SEC on October 28, 2021), the Company reported a modest increase to its estimated warranty costs of $44 million and estimated that its "reasonably possible costs in excess of our accruals for material field service actions and customer satisfaction actions is a range of up to about $900 million in the aggregate."

61.   In its 2021 10-K, the Company reported a $5.7 billion and 5.9% improvement in automotive segment EBIT and EBIT margin, respectively.

62.   In its 1Q22 10-Q (filed with the SEC on April 28, 2022), the Company reported a modest increase to its estimated warranty costs of $21 million and estimated that its "reasonably possible costs in excess of our accruals for material field service actions and customer satisfaction actions is a range of up to about $700 million in the aggregate."

63.   In its 2Q22 10-Q (filed with the SEC on July 28, 2022), the Company estimated that its "reasonably possible costs in excess of our accruals for material field service actions and customer satisfaction actions is a range of up to about $700 million in the aggregate."

64.   In its 3Q22 10-Q (filed with the SEC on October 27, 2022), the Company estimated that its "reasonably possible costs in excess of our accruals for material field service actions and customer satisfaction actions is a range of up to about $700 million in the aggregate."

65.   In its 2022 10-K, the Company and the Ford Board reported a $9.7 billion and 6.5% improvement in automotive segment EBIT and EBIT margin, respectively, offset in part by higher warranty expense, and estimated that its "reasonably possible costs in excess of our accruals for material field service actions and customer satisfaction actions is a range of up to about $700 million in the aggregate."

66.   In its 1Q23 10-Q (filed with the SEC on May 3, 2023), the Company reported a $2.6 billion and 10.4% improvement in Ford Blue EBIT and EBIT margin, respectively, a $1.4 billion and 10.3% improvement in Ford Pro EBIT and EBIT margin, both offset in part by higher warranty expense, and estimated that its "reasonably possible costs in excess of our accruals for material field service actions

and customer satisfaction actions is a range of up to about $700 million in the aggregate."

67.    In its 2Q23 10-Q (filed with the SEC on July 28, 2023), the Company reported a $2.4 billion and 15.3% improvement in Ford Pro EBIT and EBIT margin, respectively, offset in part by "higher warranty costs (primarily driven by inflationary cost pressures)," and estimated that its "reasonably possible costs in excess of our accruals for material field service actions and customer satisfaction actions is a range of up to about $1 billion in the aggregate."

68.    In its 3Q23 10-Q (filed with the SEC on October 27, 2023), the Company reported a $1.7 billion and 6.7% improvement in Ford Blue EBIT and EBIT margin, respectively, and $1.7 billion and 12% improvement in Ford Pro EBIT and EBIT margin, respectively, both offset in part by "higher warranty costs (reflecting an increase for field service actions and inflationary cost pressures)," and estimated that its "reasonably possible costs in excess of our accruals for material field service actions and customer satisfaction actions is a range of up to about $1.5 billion in the aggregate."

69.    In its 2023 10-K, the Company and the Ford Board reported a $7.5 billion and 7.3% improvement in Ford Blue EBIT and EBIT margin, respectively, and $7.2 billion and 12.4% improvement in Ford Pro EBIT and EBIT margin, respectively, both offset in part by "higher warranty costs (reflecting inflationary

cost pressures and increased field service actions),” and estimated that its “reasonably possible costs in excess of our accruals for material field service actions and customer satisfaction actions is a range of up to about $1.3 billion in the aggregate.”

70.    In its 1Q24 10-Q (filed with the SEC on April 25, 2024), the Company reported a $1.7 billion and 4.2% decrease in Ford Blue EBIT and EBIT margin, respectively, and $7.2 billion and 12.4% improvement in Ford Pro EBIT and EBIT margin, respectively, with higher costs attributed in part to “higher warranty costs,” and estimated that its “reasonably possible costs in excess of our accruals for material field service actions and customer satisfaction actions is a range of up to about $1.3 billion in the aggregate.”

### D.    Ford Discloses Increased Warranty Reserves, “Lots Of Work Ahead . . . To Raise Quality And Reduce Costs And Complexity.”

71.    On July 24, 2024, the Company filed with the SEC a Form 8-K attaching a press release disclosing its second quarter 2024 financial results. The press release reported net income of $1.8 billion and adjusted EBIT of $2.8 billion. For Ford Blue, the Company reported second quarter “EBIT of $1.2 billion,” down $1.1 billion year-over-year, and EBIT margin of 4.4%, down approximately 50% from the prior year’s quarter and half, “primarily driven by higher warranty costs,” and revised downward the full-year EBIT outlook for Ford Blue “of $6.0 billion to $6.5 billion,” reflecting higher warranty costs. The press release reported that “profitability was

affected by an increase in warranty reserves," and pegged the increase of cost to Ford Blue at $1.4 billion, inclusive of increased warranty costs. Commenting on the increased warranty costs, Defendant Lawler said: "We still have lots of work ahead of us to raise quality and reduce costs and complexity."

72.   Later the same day, on a conference call with financial analyst and investors, Defendant Lawler further disclosed that Ford was "seeing emerging headwinds in warranty." When asked by an analyst for more visibility on earnings given the "persistent warranty issues" facing Ford and "how frequently the surprise warranty issues keep popping up," Defendant Farley responded that the problem stemmed from the size of "new technology in our vehicles. And that new technology is difficult for the dealers to diagnose when customers come in and say something is wrong" . . . which in turn "hits our warranty reserves."

73.   On July 25, 2024, the *Associated Press* published an article entitled "Ford shares slide as disappointing Q2 adjusted profit rattles investors." The article reported that the Company's shares tumbled 17% in midday trading because the financial results reported the day before "badly missed Wall Street's expectations as it spent more money fixing customers' cars and trucks." According to the article, Ford's reported adjusted profit of 47 cents per share "was far short of industry analysts' estimates of 68 cents, according to FactSet." The article reported further that "warranty costs have vexed [Ford] for several years and lopped billions off of

its profits." The article noted that warranty and recall costs were "$800 million more than the first quarter and $700 million more than the prior year."

74.    On July 25, 2024, the Company's stock dropped 18.4% to close at $11.16 per share from the previous closing price of $13.67.

### E.    Ford Solicits Shareholder Proxies For The Election of Directors And Approval of Compensation Plans

75.    On March 31, 2023, and March 29, 2024, the Company filed Proxy Statements with the SEC (the "2023 Proxy" and "2024 Proxy," respectively, collectively the "Proxy Statements"). The Proxy Statements were signed by Defendant Bill Ford on behalf of the Board.

76.    By the Proxy Statements, Defendants Casiano, English, Farley, Henry Ford, Bill Ford, Helman, Huntsman, Kennard, May, Mooney, Radakovich, Thornton, Veihmeyer, and Weinberg solicited stockholders to approve, among other things: (i) the election of Defendants Casiano, English, Farley, Henry Ford, Bill Ford, Helman, Huntsman, Kennard, May, Mooney, Radakovich, Thornton, Veihmeyer, and Weinberg to the Board; (ii) the compensation of the Company's named executive officers; and (iii) to approve (a) the Company's 2023 Long Term Incentive Plan (the "2023 LTIP") in the 2023 Proxy and (b) the 2024 Stock Plan for Non-Employee Directors (the "2024 Stock Plan") for the 2024 Proxy, respectively.

77.    The Proxy Statements represent that the Board engaged in vigorous oversight over risk management: "[T]he full Board of Directors has overall

responsibility for the oversight of risk management at Ford and oversees operating risk management with reviews at each of its regular Board meetings."

78.   Regarding the Audit Committee's oversight of compliance and risk reporting, the Proxy Statements represent: "The Audit Committee assists the Board of Directors in overseeing compliance and reporting risk, and the Enterprise Risk Management process itself." The Proxy Statements also represent that the Audit Committee's and Board's annual review process includes a review and update of the list of critical risks facing the Company, and monitors those risk movements and emerging trends. Furthermore, the Proxy Statements represent that the Enterprise Risk Management team (overseen by the Audit Committee) reviews annual survey results with outside advisors to ensure the Company assessment is up to date with external risk developments.

79.   Regarding the Board's oversight of compliance and risk management, the Proxy Statements represent that ford has a specific review process to ensure that risks and opportunities presented to the business are addressed:

> We have institutionalized a regular Forecast, Controls and Risk Review and Special Attention Review process where the senior leadership of the Company reviews the status of the business, the risks and opportunities presented to the business (in the areas of compliance, reporting, operating, and strategic risks), and develops specific plans to address those risks and opportunities.

80.   The Proxy Statements represent that the Company has "extensive and effective risk management processes":

Ford has extensive and effective risk management processes, relating specifically to compliance, reporting, operating, and strategic risks.

Compliance Risk encompasses matters such as legal and regulatory compliance ...

Reporting Risk covers Sarbanes-Oxley compliance, disclosure controls and procedures, and accounting compliance.

81.     The Proxy Statements represent that the Board implemented controls and procedures to assure that the Company's business is operated at the highest level of integrity:

Ford is committed to operating its business with the highest level of integrity. The Company has published on its website (www.corporate.ford.com) its Code of Conduct, which all officers and employees are required to follow. These expectations are reinforced in mandatory online training courses for all Ford salaried full-time, parttime, and agency workers, including an annual Code of Conduct course. These courses are periodically refreshed and reviewed to ensure the content remains relevant and appropriate. In addition, the Company has adopted, and published on its website, codes of ethics that apply to all directors and senior financial personnel, including the chief executive officer. Any waiver of, or amendments to, the codes of ethics for directors or executive officers, including the chief executive officer, the chief financial officer, and the principal accounting officer, must be approved by the Nominating and Governance Committee, and any such waivers or amendments will be disclosed promptly by the Company by posting such waivers or amendments to its website. Both the Audit Committee and the Nominating and Governance Committee review management's monitoring of compliance with the Company's Code of Conduct. Printed copies of each of the codes of ethics referred to above are also available by writing to our Shareholder Relations Department at Ford Motor Company, Shareholder Relations, P.O. Box 6248, Dearborn, MI 48126.

82.     The 2023 Proxy Statement represents that the Compensation, Talent and Culture Committee of the Board prioritized in the 2022 Incentive Bonus Plan's Quality metric the repair rate of vehicles in their first three months of service, which has a high correlation to time-in-service quality and to warranty cost per unit, both of which are critical to Ford's competitiveness and business performance, and removed from consideration the speed associated with resolving quality issues.

83.     The foregoing statements in the 2023 Proxy Statement were false and misleading and omitted material information.  In fact, the Board failed to implement and maintain an effective system of internal controls over financial reporting and director compensation and the Company has been substantially damaged thereby.

84.     On May 11, 2023, Ford filed with the SEC a Current Report on Form 8-K announcing, that as a result of the material misstatements and omissions contained in the 2023 Proxy Statement, Company shareholders voted to approve, *inter alia*: (i) the compensation of the Company's named executive officers; (ii) the 2023 LTIP; and (iii) the election of Defendants Casiano, English, Farley, Henry Ford, Bill Ford, Helman, Huntsman, Kennard, May, Mooney, Radakovich, Thornton, Veihmeyer, and Weinberg as directors.

85.     As a result of the material misstatements and omissions contained in the 2023 Proxy Statement, Defendants Farley's and Bill Ford's inventive bonus targets as a percent of salary for 2022 adjusted to 200% and 59%, respectively.

86.     As a result of the material misstatements and omissions contained in the 2023 Proxy Statement, some of the Individual Defendants received lucrative compensation based on the solicitation of the 2023 LTIP. Specifically, on March 4, 2024, Defendant Farley was awarded 509,890 restricted stock units ("RSUs"), Defendant Bill Ford was awarded 397,488 RSUs, and Defendant Lawler was awarded 135,635 RSUs.

87.     On May 14, 2024, Ford filed with the SEC a Current Report on Form 8-K announcing, that as a result of the material misstatements and omissions contained in the 2024 Proxy Statement: (i) Defendants Casiano, English, Farley, Henry Ford, Bill Ford, Helman, Huntsman, Kennard, May, Mooney, Radakovich, Thornton, Veihmeyer, and Weinberg were reelected as directors; (ii) the compensation of the Company's named executive officers was approved; and (iii) the 2024 Stock Plan was approved.[5] The Individual Defendants received lucrative compensation based on the solicitation of the 2024 Stock Plan. Specifically, on May 16, 2024, Veihmeyer received 27,867 Company stock (worth approximately $344,994); Casiano, Henry Ford, Helman, Kennard, Mooney, Thornton, and Radakovich, each received 17,366 shares of Company stock units (worth approximately $214,991); and English, May,

---

[5] Form 8-K filed May 14, 2024.

and Weinberg each received 25,444 shares of Company stock units (worth approximately \$314,997).[6]

**F.    Ford Agrees To A Consent Order And To Pay Up to \$165 Million Penalty**

88.    On November 13, 2024, Ford entered into a consent order with the NHTSA after a federal investigation found that Ford moved too slowly to recall vehicles with faulty rearview cameras and failed to provide accurate and complete recall information, as required by the Safety Act.

89.    As part of the consent order:

   a.  Ford agreed to pay up to \$165 million in civil penalties - the second-largest penalty in NHTSA history;

   b.  An independent third-party monitor will oversee the automaker's recall performance obligations for at least three years;

   c.  Ford has to review all recalls over the last three years to make sure enough vehicles have been recalled, and file new recalls if necessary;

   d.  The company also must review and change its recall decision-making process, improving the way it analyzes data to find safety defects in its vehicles; and

   e.  Ford must also invest in technology so it can trace parts by vehicle identification numbers.

90.    Under the Safety Act, automakers are required to notify the NHTSA by filing a defect report within five working days of discovering a safety defect in a line

---

[6] Forms 4 filed May 17, 2024 by Casiano, English, Henry Ford, Helman, Kennard, May, Mooney, Radakovich, Thornton, Veihmeyer, and Weinberg.

of vehicles. A significant recall occurred for the Company in September 2020. It involved more than 620,000 vehicles in the U.S. (over 700,000 in North America) with faulty rear-view cameras. The issue affected several 2020 models, including the F-Series pickup, the best-selling vehicle in the U.S.

91.    According to NHTSA documents, Ford identified warranty claims related to the defective cameras between February and April 2020, and the issue was brought before a Ford committee in May of that year. In July 2020, NHTSA contacted Ford about complaints it had received regarding camera failures. During an August 2020 meeting with NHTSA, Ford presented data showing high camera failure rates in many 2020 models.

92.    The recall was initiated on September 23, 2020. However, about a year later, NHTSA began investigating whether Ford acted promptly enough and whether the recall included all affected vehicles. In 2022 and 2024, Ford was forced to issue two additional recalls for the same camera defect, adding approximately 24,000 vehicles to the original recall.

93.    In the consent order, NHTSA concluded that its investigation revealed multiple legal violations by Ford, including delays in initiating recalls for vehicles with faulty cameras, providing the agency with inaccurate or incomplete information, and failing to submit required quarterly reports for additional recalls.

### G.    The Insider Seller Defendants Profit From The Misconduct

94.    While the Company's stock was inflated due to the false and misleading statement and material omissions alleged herein, between February 2021, and April 2024, Defendants Farley, Huntsman, and Lawler sold substantial amounts of their Ford shareholdings, collectively selling 376,319 Ford shares, and reaping more than $5.7 million in unlawful proceeds:

- Defendant Farley sold 265,264 Ford shares, reaping proceeds of approximately $4.3 million.

| Date | Number of Shares Sold | Price | Proceeds |
|---|---|---|---|
| 3/3/2022 | 185,343 | $17.85 | $3,308,928.58 |
| 3/3/2023 | 79,921 | $12.86 | $1,027,840.00 |
| **Total** | **265,264** | | **$4,336,768.58** |

- Defendant Huntsman sold 81,234 Ford shares, reaping proceeds of approximately $0.9 million:

| Date | Number of Shares Sold | Price | Proceeds |
|---|---|---|---|
| 5/24/2024 | 81,234 | $12.091 | $982,200.29 |
| **Total** | **81,234** | | **$982,200.29** |

- Defendant Lawler sold 29,821 Ford shares, reaping proceeds of approximately $0.4 million:

| Date | Number of Shares Sold | Price | Proceeds |
|---|---|---|---|
| 3/3/2023 | 29,821 | $13.0654 | $389,623.29 |
| **Total** | **29,821** | | **$389,623.29** |

### H.    Ford Repurchases Almost 55 Million Of Its Shares At Inflated Prices

95.    The Individual Defendants (except Defendant Lawler) breached their fiduciary duties by causing Ford to repurchase its own stock at prices that were artificially inflated due to the misrepresentations alleged herein. Between November 2022 and June 2024, 54,780,000 shares of Ford common stock were repurchased for $727,247,844.

96.    According to the 2022 10-K, between November 1 and 30, 2022, the Company purchased 35 million shares of its common stock for approximately $483,350,000 at an average price of $13.81 per share.

97.    According to the 2Q24 10-Q (filed with the SEC on July 25, 2024), between May 1 and 31, 2024, the Company purchased 19,299,600 shares of its common stock for $238,157,064 at an average price of $12.34 per share, and between June 1 and 30, 2024, the Company purchased 480,400 shares of its common stock for $5,740,780 at an average price of $11.95 per share.

98.    The prices at which Ford was caused by the Individual Defendants (except Defendant Lawler) to repurchase its common stock were artificially inflated by the false and misleading statements and material omissions described herein, causing substantial damages to the Company and its shareholders.

## I.      Ford Is Sued In Securities Class Action Lawsuits

99.    Following the above disclosures regarding the Company's increased warranty costs, securities class action lawsuits were filed against Ford and Defendants Farley and Lawler. On August 8, 2024, *Guzman v. Ford Motor Co., et al.*, No. 2:24-cv-12080-LVP-KGA (E.D. Mi.), was filed seeking damages on behalf of persons or entities who purchased or otherwise acquired Ford securities between April 27, 2022, and July 24, 2024, inclusive (the "Guzman Action"). Guzman charges the named defendants with violations of Sections 10(b) and 20(a) of the Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC. Guzman alleges that the named defendants made false and/or misleading statements and/or failed to disclose that: (1) that the Company had deficiencies in its quality assurance of vehicle models since 2022; (2) that, as a result, the Company was experiencing higher warranty costs; (3) that the Company's warranty reserves did not accurately reflect the quality issues in vehicles sold since 2022; (4) that, as a result, the Company's profitability was reasonably likely to suffer; and (5) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

100.   On September 23, 2024, *Sklodowski v. Ford Motor Co., et al.*, No. 2:24-cv-12492-TGP-EAS (E.D. Mi.), was filed seeking damages on behalf of persons or

entities who purchased or otherwise acquired publicly traded Ford securities between October 28, 2021 and July 24, 2024, inclusive, with similar claims against the Company and Farley and Lawler as the Guzman Action.

101.  On November 26, 2024, the securities class actions were consolidated under the caption *Guzman v. Ford Motor Co., et al*., No. 2:24-cv-12080-LVP-KGA (E.D. Mi.) (the "Securities Class Action").

## VI.    DERIVATIVE ALLEGATIONS

102.  Plaintiffs bring this action derivatively and for the benefit of Ford to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Ford, as well as the aiding and abetting thereof, and violations of Section 14(a) of the Exchange Act. Plaintiffs also seek contribution under Sections 10(b) and 21D of the Exchange Act from Defendants Farley and Lawler.

103.  Plaintiffs are stockholders of the Company and were stockholders of the Company at the time of the transactions alleged herein.  Plaintiffs will adequately and fairly represent the interests of the Company and its stockholders in enforcing and prosecuting their rights.

104.  Under the circumstances presented herein, demand is futile and, thus, excused.

## A.     Demand Upon Defendant Farley Is Excused

105.   Defendant Farley is President and CEO of Ford and a director since October 2020, as well as President of Ford Model e since March 2022. He was also COO of Ford from February 2020 until October 2020. Therefore, Farley is not independent. As an employee of Ford, the Company provides Farley with his principal occupation from which he receives substantial compensation. In 2023, Farley received a total compensation package exceeding $26 million. Indeed, Ford's 2024 Proxy does not list Farley as an independent director.

106.   Farley had a powerful incentive to inflate Ford's stock price through false and misleading financial information in order to profit from insider sales. Farley sold 265,264 Ford shares while in possession of material adverse non-public information, reaping proceeds of over $4.3 million. Thus, through the Individual Defendants' material omissions and misrepresentations to the market, Farley reaped a material personal benefit not shared with other Ford stockholders from the misconduct pled herein.

107.   Farley had a powerful incentive to inflate Ford's stock price through false and misleading information in order to profit from his award of 509,890 RSUs under the 2023 LTIP. Thus, through the Individual Defendants' material omissions and misrepresentations to the market, Farley reaped a material personal benefit not shared with other Ford stockholders from the misconduct pled herein.

108. Farley faces a substantial likelihood of liability because he traded on material, nonpublic information and because he disseminated false and misleading information to the market.

109. Farley is named as a defendant in the pending Securities Class Action. As such, he is incapable of considering a demand to commence and vigorously prosecute this action with the required independence and disinterest.

110. Farley authorized the Proxy Statements containing false and misleading statements and material omissions and faces a substantial likelihood of liability therefor.

111. Farley benefitted from the violation of Section 14(a) of the Exchange Act pled herein by securing his election to the Ford Board through the false and misleading statements and material omissions in the Proxy Statements.

112. Farley, as a director of Ford, was required to, but failed to: (1) implement and maintain an effective system of internal controls over financial reporting to ensure that the Company's financial statements were accurate and complete; (2) implement and maintain an effective system of internal controls and corporate governance practices and procedures to monitor the material risks posed to the Company, its stockholders, and customers; and (3) investigate and take action when presented with red flags evidencing that the Company had issued false and

misleading financial statements.  Had Farley taken timely action the damage caused to Ford could have been prevented or at least minimized.

113.  Farley is beholden to Defendants English, Henry Ford, and Bill Ford, who are controlling shareholders of Ford and who have arranged to profit from related party transactions with the Company that Farley has approved. As such Farley will not act against Defendants English, Henry Ford, and Bill Ford given their positions as controlling shareholders which enable them to control Ford's management and affairs, and most matters requiring stockholder approval.

114.  Farley is neither disinterested nor independent. Any demand upon Defendant Farley is futile and, thus, excused.

### B. Demand Upon Defendant Casiano Is Excused

115.  Defendant Casiano has been a Ford director since 2003 and is a member of the Company's Audit Committee, the Nominating and Governance Committee, and the Sustainability, Innovation and Policy Committee.

116.  As a member of the Audit Committee, Casiano had duties regarding oversight of the risks facing the Company, ensuring the accuracy of the Company's financial statements, and Ford's compliance with relevant laws, rules, and regulations. In light of the Audit Committee's failure to implement and maintain an effective system of internal controls over financial reporting, Casiano utterly failed to perform these essential duties.

117. Casiano is beholden to Defendants English, Henry Ford, and Bill Ford, who are controlling shareholders of Ford and who have arranged to profit from related party transactions with the Company that Casiano has approved. As such Casiano will not act against Defendants English, Henry Ford, and Bill Ford given their positions as controlling shareholders which enable them to control Ford's management and affairs, and most matters requiring stockholder approval.

118. Casiano authorized the Proxy Statements containing false and misleading statements and material omissions and faces a substantial likelihood of liability therefor.

119. Casiano benefitted from the violation of Section 14(a) of the Exchange Act pled herein by securing her election to the Ford Board through the false and misleading statements and material omissions in the Proxy Statements.

120. Casiano, as a director of Ford, was required to, but failed to: (1) implement and maintain an effective system of internal controls over financial reporting to ensure that the Company's financial statements were accurate and complete; (2) implement and maintain an effective system of internal controls and corporate governance practices and procedures to monitor the material risks posed to the Company, its stockholders, and customers; and (3) investigate and take action when presented with red flags evidencing that the Company had issued false and

misleading financial statements.  Had Casiano taken timely action the damage caused to Ford could have been prevented or at least minimized.

121.  As a member of the Audit Committee, Casiano had duties regarding oversight of the risks facing the Company and Ford's compliance with relevant laws, rules, and regulations. Casiano utterly failed to perform these essential duties.

122.  Casiano is neither disinterested nor independent.  Any demand upon Defendant Casiano is futile and, thus, excused.

### C.   Demand Upon Defendant English Is Excused

123.  Defendant English has been a Ford director since May 2021. She is the daughter of Defendant Bill Ford and Defendant Henry Ford is her second cousin. According to the Proxy Statements, these Ford family members have a "special interest" in the Company, "have always played an important role in the business," and their Board membership continues the "family stewardship" tradition of the Company. Hence, English cannot be independent and disinterested, especially not with respect to Bill and Henry Ford. Indeed, Ford's 2024 Proxy does not list English as an independent director.

124.  Defendant English is also the beneficial owner of 1,406945 shares of Ford Class B stock, or 1.99% thereof. The Company's Class B stock controls approximately 40% of the general voting power of stockholders and is held by only four holders of record. These holders of record are essentially Ford family members

and/or trusts for the benefit of the Ford family member beneficiaries of which English is only a beneficiary. Furthermore, the Company's Class B stock is not traded on any public stock exchange, but may be converted into an equal number of shares of the Company's common stock to effect the sale or other disposition of said stock. English is therefore a controlling shareholder and cannot be disinterested and independent.

125.   English authorized the Proxy Statements containing false and misleading statements and material omissions and faces a substantial likelihood of liability therefor.

126.   Defendant English benefitted from the violation of Section 14(a) of the Exchange Act pled herein by securing her election to the Ford Board through the false and misleading statements and material omissions in the Proxy Statements.

127.   English is beholden to and controlled by Defendant Bill Ford, her father, who is a controlling shareholder in the Company by virtue of his ownership of almost 28% of Ford's Class B stock.[7] Therefore, English will not take action against Defendant Bill Ford because this would require her to take action against her father and a controlling shareholder of the Company. As such English will not act against Henry Ford, her second cousin, given their positions as controlling shareholders

---

[7] 2024 Proxy at 20.

which enable them to control Ford's management and affairs, and most matters requiring stockholder approval.

128. English, as a director of Ford, was required to, but failed to: (1) implement and maintain an effective system of internal controls over financial reporting to ensure that the Company's financial statements were accurate and complete; (2) implement and maintain an effective system of internal controls and corporate governance practices and procedures to monitor the material risks posed to the Company, its stockholders, and customers; and (3) investigate and take action when presented with red flags evidencing that the Company had issued false and misleading financial statements. Had English taken timely action the damage caused to Ford could have been prevented or at least minimized.

129. English is neither disinterested nor independent. Any demand upon Defendant English is futile and, thus, excused.

**D.     Demand Upon Defendant Henry Ford Is Excused**

130. Defendant Henry Ford has been a Ford director since May 2021. He is the son of Edsel Ford (who owns over 4.7 million shares of Ford Class B stock, or 6.69%), a first cousin of Defendant Bill Ford, and Defendant English is his second cousin. According to the Proxy Statements, these Ford family members have a "special interest" in the Company, "have always played an important role in the business," and their Board membership continues the "family stewardship" tradition

of the Company. Hence, Henry Ford cannot be independent and disinterested, especially not with respect to Bill Ford and English. Indeed, Ford's 2024 Proxy does not list Henry Ford as an independent director.

131.  Henry Ford cannot be independent and disinterested because his father Edsel Ford has a lucrative consulting agreement with the Company and the Company provides facilities (including office space) and an administrative assistant to Edsel Ford gratis.

132.  Henry Ford cannot be independent and disinterested because he and his father Edsel are owed substantial monies under a promissory note connected with their sale of a controlling interest in Marketing Associates, LLC ("Marketing Assoc."), a marketing company, which entered into a related party transaction with Ford, which paid Marketing Assoc. more than $60 million for marketing and related services.

133.  Defendant Henry Ford is also the beneficial owner of 1,691,807 shares of Ford Class B stock, or 2.39% thereof. The Company's Class B stock controls approximately 40% of the general voting power of stockholders and is held by only four holders of record. These holders of record are essentially Ford family members and or trusts for the benefit of the Ford family member beneficiaries of which Henry Ford is one. Furthermore, the Company's Class B stock is not traded on any public stock exchange, but may be converted into an equal number of shares of the

Company's common stock to effect the sale or other disposition of said stock. Hence, Henry Ford cannot be independent and disinterested because he will not investigate and take action against those responsible for the wrongdoing pled herein because doing so would harm him, his investments, and his relatives. Henry Ford is therefore a controlling shareholder and cannot be disinterested and independent. As a result, English would be interested in a demand regarding his own wrongdoing, and demand upon him is excused.

134. Henry Ford authorized the Proxy Statements containing false and misleading statements and material omissions and faces a substantial likelihood of liability therefor.

135. Defendant Henry Ford benefitted from the violation of Section 14(a) of the Exchange Act pled herein by securing his election to the Ford Board through the false and misleading statements and material omissions in the Proxy Statements.

136. Henry Ford is beholden to and controlled by Defendant Bill Ford, his first cousin once removed, who is a controlling shareholder in the Company by virtue of Bill Ford's ownership of almost 28% of Ford's Class B stock. Therefore, Henry Ford will not take action against Defendant Bill Ford because this would require him to take action against his cousin and a controlling shareholder of the Company.

137. Henry Ford, as a director of Ford, was required to, but failed to: (1) implement and maintain an effective system of internal controls over financial

reporting to ensure that the Company's financial statements were accurate and complete; (2) implement and maintain an effective system of internal controls and corporate governance practices and procedures to monitor the material risks posed to the Company, its stockholders, and customers; and (3) investigate and take action when presented with red flags evidencing that the Company had issued false and misleading financial statements. Had English taken timely action the damage caused to Ford could have been prevented or at least minimized.

138.   Henry Ford is neither disinterested nor independent. Any demand upon Defendant Henry Ford is futile and, thus, excused.

## E.    Demand Upon Defendant Bill Ford Is Excused

139.   Defendant Bill Ford has been a Ford director since 1988, Chair of the Board since 1999, and Executive Chair of the Board since September 2006. He is a first cousin of Edsel Ford (the father of Henry Ford), and he is the father of Defendant English. According to the Proxy Statements, these Ford family members have a "special interest" in the Company, "have always played an important role in the business," and their Board membership continues the "family stewardship" tradition of the Company. Hence, Bill Ford cannot be independent and disinterested, especially not with respect to Henry Ford and English. Indeed, Ford's 2024 Proxy does not list Bill Ford as an independent director.

140.   Bill Ford cannot be independent and disinterested because he owns a minority equity interest in and is a director and officer of The Detroit Lions, Inc. (the "Lions"), a professional football team, and the Company entered into a multi-year stadium naming and license agreement with the Lions for $50 million, named Lions' stadium "Ford Field," and provides eight new model year Ford, Lincoln, or Mercury brand vehicles for use by to the Lions management and staff in each second successive year.

141.   Bill Ford cannot be independent and disinterested because he has a 7.6% interest in Fontinalis Capital Partners II, a venture capital fund that invests in next-generation mobility start-up entities, in which the Company has invested approximately $10 million.

142.   Defendant Bill Ford is also the beneficial owner of 19,592,914 shares of Ford Class B stock, or 27.65% thereof and almost 3 million shares of Ford's common stock. The Company's Class B stock controls approximately 40% of the general voting power of stockholders and is held by only four holders of record. These holders of record are essentially Ford family members and or trusts for the benefit of the Ford family member beneficiaries of which Bill Ford is one. Furthermore, the Company's Class B stock is not traded on any public stock exchange, but may be converted into an equal number of shares of the Company's common stock to effect the sale or other disposition of said stock. Bill Ford is

therefore a controlling shareholder and cannot be disinterested and independent.  As a result, Bill Ford would be interested in a demand regarding his own wrongdoing, and demand upon him is excused.

143.  Defendants Bill Ford, Weinberg, Thornton, and Bill Ford have longstanding business and personal relationships which precludes them from acting with the required independence and disinterest with respect to considering whether to institute lawsuits against each other.  Defendants Bill Ford and Thornton are close friends since their youth, when they both attended The Hotchkiss School, a private college-preparatory day and boarding school in Lakeville, Connecticut.  Their personal ties and those of Defendant Weinberg are so strong that they were scrutinized in 1999, when Bill Ford received 400,000 shares in Goldman Sachs's 1999 IPO (the largest individual award of that IPO by a large margin) while Thornton was co-president of Goldman Sachs and on the Board of Ford, and while Weinberg served as an investment banking advisor for Ford at Goldman Sachs, and after it became known that Ford had paid Goldman Sachs $87 million in banking fees since 1996.

144.  Bill Ford had a powerful incentive to inflate Ford's stock price through false and misleading financial information in order to profit from his award of 397,488 RSUs under the 2023 LTIP.  Thus, through the Individual Defendants' material omissions and misrepresentations to the market about Ford's financial

condition, Bill Ford reaped a material personal benefit not shared with other Ford stockholders from the misconduct pled herein.

145.  Bill Ford signed the Proxy Statements containing false and misleading statements and material omissions and faces a substantial likelihood of liability therefor.

146.  Defendant Bill Ford benefitted from the violation of Section 14(a) of the Exchange Act pled herein by securing his election to the Ford Board through the false and misleading statements and material omissions in the Proxy Statements.

147.  Bill Ford is beholden to Defendant Henry Ford, his first cousin once removed, and English, his daughter. Therefore, Bill Ford will not take action against Defendants Henry Ford and English because this would require him to take action against his cousin and daughter.

148.  Bill Ford, as a director of Ford, was required to, but failed to: (1) implement and maintain an effective system of internal controls over financial reporting to ensure that the Company's financial statements were accurate and complete; (2) implement and maintain an effective system of internal controls and corporate governance practices and procedures to monitor the material risks posed to the Company, its stockholders, and customers; and (3) investigate and take action when presented with red flags evidencing that the Company had issued false and

misleading financial statements.   Had Bill Ford taken timely action the damage caused to Ford could have been prevented or at least minimized.

149.   Bill Ford is neither disinterested nor independent.  Any demand upon Defendant Bill Ford is futile and, thus, excused.

### F.   Demand Upon Defendant Helman Is Excused

150.   Defendant Helman has been a Ford director since 2011 and is Chair of the Company's Sustainability, Innovation and Policy Committee and a member of the Finance Committee and the Nominating and Governance Committee.

151.   Helman is beholden to Defendants English, Henry Ford, and Bill Ford, who are controlling shareholders of Ford and who have arranged to profit from related party transactions with the Company that Helman has approved. As such Helman will not act against Defendants English, Henry Ford, and Bill Ford given their positions as controlling shareholders which enable them to control Ford's management and affairs, and most matters requiring stockholder approval.

152.   Defendants Helman and Wienberg have longstanding business and personal relationships which precludes them from acting with the required independence and disinterest with respect to considering whether to institute lawsuits against each other.   In addition to their service on the Board, they serve together on the Board of The Steppingstone Foundation, a Boston-based nonprofit

that prepares students from historically marginalized communities to access, navigate, and graduate from college.

153. Helman authorized the Proxy Statements containing false and misleading statements and material omissions and faces a substantial likelihood of liability therefor.

154. Helman benefitted from the violation of Section 14(a) of the Exchange Act pled herein by securing his election to the Ford Board through the false and misleading statements and material omissions in the Proxy Statements.

155. Helman, as a director of Ford, was required to, but failed to: (1) implement and maintain an effective system of internal controls over financial reporting to ensure that the Company's financial statements were accurate and complete; (2) implement and maintain an effective system of internal controls and corporate governance practices and procedures to monitor the material risks posed to the Company, its stockholders, and customers; and (3) investigate and take action when presented with red flags evidencing that the Company had issued false and misleading financial statements.   Had Helman taken timely action the damage caused to Ford could have been prevented or at least minimized.

156. Helman, as a member of the Nominating and Governance Committee, had duties to ensure the implementation and effectiveness of Ford's Code of Conduct

and Corporate Governance Principles. Helman utterly failed to perform these essential duties.

157. Helman is neither disinterested nor independent. Any demand upon Defendant Helman is futile and, thus, excused.

### G. Demand Upon Defendant Huntsman Is Excused

158. Defendant Huntsman has been a Ford director since 2011 and a member of the Company's Sustainability, Innovation and Policy Committee.

159. Huntsman is beholden to Defendants English, Henry Ford, and Bill Ford, who are controlling shareholders of Ford and who have arranged to profit from related party transactions with the Company that Huntsman has approved. As such Huntsman will not act against Defendants English, Henry Ford, and Bill Ford given their positions as controlling shareholders which enable them to control Ford's management and affairs, and most matters requiring stockholder approval.

160. Huntsman had a powerful incentive to inflate Ford's stock price through false and misleading financial information in order to profit from insider sales. Huntsman sold 81,234 Ford shares while in possession of material adverse non-public information, reaping proceeds of nearly $1 million. Thus, through the Individual Defendants' material omissions and misrepresentations to the market, Huntsman reaped a material personal benefit not shared with other Ford stockholders from the misconduct pled herein.

161.  Huntsman faces a substantial likelihood of liability because he traded on material, nonpublic information and because he disseminated false and misleading information to the market.

162.  Huntsman authorized the Proxy Statements containing false and misleading statements and material omissions and faces a substantial likelihood of liability therefor.

163.  Huntsman benefited from the violation of Section 14(a) of the Exchange Act pled herein by securing his election to the Ford Board through the false and misleading statements and material omissions in the Proxy Statements.

164.  Huntsman, as a director of Ford, was required to, but failed to: (1) implement and maintain an effective system of internal controls over financial reporting to ensure that the Company's financial statements were accurate and complete; (2) implement and maintain an effective system of internal controls and corporate governance practices and procedures to monitor the material risks posed to the Company, its stockholders, and customers; and (3) investigate and take action when presented with red flags evidencing that the Company had issued false and misleading financial statements.  Had Huntsman taken timely action the damage caused to Ford could have been prevented or at least minimized.

165.  Huntsman is neither disinterested nor independent.  Any demand upon Defendant Huntsman is futile and, thus, excused.

### H.    Demand Upon Defendant Kennard Is Excused

166. Defendant Kennard is a Ford director since 2015, Chair of the Nominating and Governance Committee and a member of the Finance Committee and the Sustainability, Innovation and Policy Committee.

167.  Kennard is beholden to Defendants English, Henry Ford, and Bill Ford, who are controlling shareholders of Ford and who have arranged to profit from related party transactions with the Company that Kennard has approved. As such Kennard will not act against Defendants English, Henry Ford, and Bill Ford given their positions as controlling shareholders which enable them to control Ford's management and affairs, and most matters requiring stockholder approval.

168. Defendants Kennard and Mooney have a long-standing business relationship which precludes them from acting with the required independence and disinterest with respect to considering whether to institute lawsuits against each other.  In addition to their service on the Board of Ford, they serve together on the Board of AT&T Inc. since at least 2014.

169. Kennard authorized the Proxy Statements containing false and misleading statements and material omissions and faces a substantial likelihood of liability therefor.

170. Defendant Kennard benefitted from the violation of Section 14(a) of the Exchange Act pled herein by securing his election to the Ford Board through the false and misleading statements and material omissions in the Proxy Statements.

171. Kennard, as a director of Ford, was required to, but failed to: (1) implement and maintain an effective system of internal controls over financial reporting to ensure that the Company's financial statements were accurate and complete; (2) implement and maintain an effective system of internal controls and corporate governance practices and procedures to monitor the material risks posed to the Company, its stockholders, and customers; and (3) investigate and take action when presented with red flags evidencing that the Company had issued false and misleading financial statements. Had Kennard taken timely action the damage caused to Ford could have been prevented or at least minimized.

172. Kennard is neither disinterested nor independent. Any demand upon Defendant Kennard is futile and, thus, excused.

### I. Demand Upon Defendant May Is Excused

173. May is a Ford director since December 2021, a member of the Company's Compensation, Talent and Culture Committee, the Finance Committee, and the Nominating and Governance Committee.

174. May is beholden to Defendants English, Henry Ford, and Bill Ford, who are controlling shareholders of Ford and who have arranged to profit from related

party transactions with the Company that May has approved. As such May will not act against Defendants English, Henry Ford, and Bill Ford given their positions as controlling shareholders which enable them to control Ford's management and affairs, and most matters requiring stockholder approval.

175.   May authorized the Proxy Statements containing false and misleading statements and material omissions and faces a substantial likelihood of liability therefor.

176.   Defendant May benefitted from the violation of Section 14(a) of the Exchange Act pled herein by securing his election to the Ford Board through the false and misleading statements and material omissions in the Proxy Statements.

177.   May, as a director of Ford, was required to, but failed to: (1) implement and maintain an effective system of internal controls over financial reporting to ensure that the Company's financial statements were accurate and complete; (2) implement and maintain an effective system of internal controls and corporate governance practices and procedures to monitor the material risks posed to the Company, its stockholders, and customers; and (3) investigate and take action when presented with red flags evidencing that the Company had issued false and misleading financial statements.  Had May taken timely action the damage caused to Ford could have been prevented or at least minimized.

178.   Helman, as a member of the Nominating and Governance Committee, had duties to ensure the implementation and effectiveness of Ford's Code of Conduct and Corporate Governance Principles. Helman utterly failed to perform these essential duties.

179.   May is neither disinterested nor independent.   Any demand upon Defendant May is futile and, thus, excused.

### J.      Demand Upon Defendant Mooney Is Excused

180.   Mooney is a Ford director since December 2019 and is a member of the Company's Audit Committee and the Nominating and Governance Committee.

181.   As a member of the Audit Committee, Mooney had duties regarding oversight of the risks facing the Company, ensuring the accuracy of the Company's financial statements, and Ford's compliance with relevant laws, rules, and regulations. In light of the Audit Committee's failure to implement and maintain an effective system of internal controls over financial reporting, Mooney utterly failed to perform these essential duties.

182.   Mooney is beholden to Defendants English, Henry Ford, and Bill Ford, who are controlling shareholders of Ford and who have arranged to profit from related party transactions with the Company that Mooney has approved. As such Mooney will not act against Defendants English, Henry Ford, and Bill Ford given

their positions as controlling shareholders which enable them to control Ford's management and affairs, and most matters requiring stockholder approval.

183. Defendants Mooney and Kennard have a long-standing business relationship which precluded them from acting with the required independence and disinterest with respect to considering whether to institute lawsuits against each other.  In addition to their service on the Board of Ford, they serve together on the Board of AT&T Inc. since at least 2014.

184. Mooney authorized the Proxy Statements containing false and misleading statements and material omissions and faces a substantial likelihood of liability therefor.

185.  Defendant Mooney benefitted from the violation of Section 14(a) of the Exchange Act pled herein by securing her election to the Ford Board through the false and misleading statements and material omissions in the Proxy Statements.

186. Mooney, as a director of Ford, was required to, but failed to: (1) implement and maintain an effective system of internal controls over financial reporting to ensure that the Company's financial statements were accurate and complete; (2) implement and maintain an effective system of internal controls and corporate governance practices and procedures to monitor the material risks posed to the Company, its stockholders, and customers; and (3) investigate and take action when presented with red flags evidencing that the Company had issued false and

misleading financial statements.   Had Mooney taken timely action the damage caused to Ford could have been prevented or at least minimized.

187.  Mooney, as a member of the Audit Committee, had duties regarding oversight of the risks facing the Company and Ford's compliance with relevant laws, rules, and regulations. Mooney utterly failed to perform these essential duties.

188.  Mooney, as a member of the Nominating and Governance Committee, had duties to ensure the implementation and effectiveness of Ford's Code of Conduct and Corporate Governance Principles. Mooney utterly failed to perform these essential duties.

189.  Mooney is neither disinterested nor independent.   Any demand upon Defendant Mooney is futile and, thus, excused.

**K.     Demand Upon Defendant Radakovich Is Excused**

190.  Defendant Radakovich has been a Ford director since April 2017 and is Chair of the Company's Compensation, Talent and Culture Committee, and a member of the Nominating and Governance Committee and the Sustainability, Innovation and Policy Committee.

191.  Radakovich is beholden to Defendants English, Henry Ford, and Bill Ford, who are controlling shareholders of Ford and who have arranged to profit from related party transactions with the Company that Radakovich has approved. As such, Radakovich will not act against Defendants English, Henry Ford, and Bill Ford given

their positions as controlling shareholders which enable them to control Ford's management and affairs, and most matters requiring stockholder approval.

192. Radakovich authorized the Proxy Statements containing false and misleading statements and material omissions and faces a substantial likelihood of liability therefor.

193. Defendant Radakovich benefitted from the violation of Section 14(a) of the Exchange Act pled herein by securing her election to the Ford Board through the false and misleading statements and material omissions in the Proxy Statements.

194. Radakovich, as a director of Ford, was required to, but failed to: (1) implement and maintain an effective system of internal controls over financial reporting to ensure that the Company's financial statements were accurate and complete; (2) implement and maintain an effective system of internal controls and corporate governance practices and procedures to monitor the material risks posed to the Company, its stockholders, and customers; and (3) investigate and take action when presented with red flags evidencing that the Company had issued false and misleading financial statements.  Had Radakovich taken timely action the damage caused to Ford could have been prevented or at least minimized.

195. Radakovich, as a member of the Nominating and Governance Committee, had duties to ensure the implementation and effectiveness of Ford's

Code of Conduct and Corporate Governance Principles. Radakovich utterly failed to perform these essential duties.

196.   Radakovich is neither disinterested nor independent.  Any demand upon Defendant Radakovich is futile and, thus, excused.

### L.    Demand Upon Defendant Thornton Is Excused

197.   Defendant Thornton is a Ford director since 1996, a member of the Company's Compensation, Talent and Culture Committee, the Finance Committee, and the Nominating and Governance Committee.

198.   Thornton is beholden to Defendants English, Henry Ford, and Bill Ford, who are controlling shareholders of Ford and who have arranged to profit from related party transactions with the Company that Thornton has approved. As such, Thornton  will not act against Defendants English, Henry Ford, and Bill Ford given their positions as controlling shareholders which enable them to control Ford's management and affairs, and most matters requiring stockholder approval.

199.  Defendants Thornton, Bill Ford, and Weinberg have longstanding business and personal relationships which precludes them from acting with the required independence and disinterest with respect to considering whether to institute lawsuits against each other.  Defendants Thornton and Bill Ford are close friends since their youth, when they both attended The Hotchkiss School, a private college-preparatory day and boarding school in Lakeville, Connecticut.  Their

personal ties and those of Defendant Weinberg are so strong that they were scrutinized in 1999, when Bill Ford received 400,000 shares in Goldman Sachs's 1999 IPO (the largest individual award of that IPO by a large margin) while Thornton was co-president of Goldman Sachs and on the Board of Ford, and while Weinberg served as an investment banking advisor for Ford at Goldman Sachs, and after it became known that Ford had paid Goldman Sachs $87 million in banking fees since 1996.

200. Thornton authorized the Proxy Statements containing false and misleading statements and material omissions and faces a substantial likelihood of liability therefor.

201.  Defendant Thornton benefitted from the violation of Section 14(a) of the Exchange Act pled herein by securing his election to the Ford Board through the false and misleading statements and material omissions in the Proxy Statements.

202.  Thornton, as a director of Ford, was required to, but failed to: (1) implement and maintain an effective system of internal controls over financial reporting to ensure that the Company's financial statements were accurate and complete; (2) implement and maintain an effective system of internal controls and corporate governance practices and procedures to monitor the material risks posed to the Company, its stockholders, and customers; and (3) investigate and take action when presented with red flags evidencing that the Company had issued false and

misleading financial statements.  Had Thornton taken timely action the damage caused to Ford could have been prevented or at least minimized.

203.  Thornton, as a member of the Nominating and Governance Committee, had duties to ensure the implementation and effectiveness of Ford's Code of Conduct and Corporate Governance Principles. Thornton utterly failed to perform these essential duties.

204.  Thornton is neither disinterested nor independent.  Any demand upon Defendant Thornton is futile and, thus, excused.

**M.    Demand Upon Defendant Veihmeyer Is Excused**

205.  Defendant Veihmeyer is a Ford director since December 2017, Chair of the Company's Audit Committee, and a member of the Nominating and Governance Committee.

206.  As Chair of the Audit Committee, Veihmeyer had duties regarding oversight of the risks facing the Company, ensuring the accuracy of the Company's financial statements, and Ford's compliance with relevant laws, rules, and regulations. In light of the Audit Committee's failure to implement and maintain an effective system of internal controls over financial reporting, Veihmeyer utterly failed to perform these essential duties.

207.  Veihmeyer is beholden to Defendants English, Henry Ford, and Bill Ford, who are controlling shareholders of Ford and who have arranged to profit from

related party transactions with the Company that Veihmeyer has approved. As such, Veihmeyer will not act against Defendants English, Henry Ford, and Bill Ford given their positions as controlling shareholders which enable them to control Ford's management and affairs, and most matters requiring stockholder approval.

208.  Veihmeyer authorized the Proxy Statements containing false and misleading statements and material omissions and faces a substantial likelihood of liability therefor.

209.  Defendant Veihmeyer benefitted from the violation of Section 14(a) of the Exchange Act pled herein by securing his election to the Ford Board through the false and misleading statements and material omissions in the Proxy Statements.

210.  Veihmeyer, as a director of Ford, was required to, but failed to: (1) implement and maintain an effective system of internal controls over financial reporting to ensure that the Company's financial statements were accurate and complete; (2) implement and maintain an effective system of internal controls and corporate governance practices and procedures to monitor the material risks posed to the Company, its stockholders, and customers; and (3) investigate and take action when presented with red flags evidencing that the Company had issued false and misleading financial statements.  Had Veihmeyer taken timely action the damage caused to Ford could have been prevented or at least minimized.

211. Veihmeyer, as a member of the Audit Committee, had duties regarding oversight of the risks facing the Company and Ford's compliance with relevant laws, rules, and regulations. Veihmeyer utterly failed to perform these essential duties.

212. Veihmeyer, as a member of the Nominating and Governance Committee, had duties to ensure the implementation and effectiveness of Ford's Code of Conduct and Corporate Governance Principles. Veihmeyer utterly failed to perform these essential duties.

213. Veihmeyer is neither disinterested nor independent. Any demand upon Defendant Veihmeyer is futile and, thus, excused.

## N. Demand Upon Defendant Weinberg Is Excused

214. Defendant Weinberg is a Ford director since December 2016, a member of the Company's Compensation, Talent and Culture Committee, the Finance Committee, the Nominating and Governance Committee, and the Sustainability, Innovation and Policy Committee.

215. Weinberg is beholden to Defendants English, Henry Ford, and Bill Ford, who are controlling shareholders of Ford and who have arranged to profit from related party transactions with the Company that Weinberg has approved. As such, Weinberg will not act against Defendants English, Henry Ford, and Bill Ford given their positions as controlling shareholders which enable them to control Ford's management and affairs, and most matters requiring stockholder approval.

216. Defendants Weinberg, Thornton, and Bill Ford have longstanding business and personal relationships which precludes them from acting with the required independence and disinterest with respect to considering whether to institute lawsuits against each other.  Their personal ties are so strong that they were scrutinized in 1999, when Bill Ford received 400,000 shares in Goldman Sachs's 1999 IPO (the largest individual award of that IPO by a large margin) while Thornton was co-president of Goldman Sachs and on the Board of Ford, and while Weinberg served as an investment banking advisor for Ford at Goldman Sachs, and after it became known that Ford had paid Goldman Sachs $87 million in banking fees since 1996.

217. Defendants Weinberg and Helman have longstanding business and personal relationships which precludes them from acting with the required independence and disinterest with respect to considering whether to institute lawsuits against each other.  In addition to their service on the Board, they serve together on the Board of The Steppingstone Foundation, a Boston-based nonprofit that prepares students from historically marginalized communities to access, navigate, and graduate from college.

218. Weinberg authorized the Proxy Statements containing false and misleading statements and material omissions and faces a substantial likelihood of liability therefor.

219.   Defendant Weinberg benefitted from the violation of Section 14(a) of the Exchange Act pled herein by securing his election to the Ford Board through the false and misleading statements and material omissions in the Proxy Statements.

220.   Weinberg, as a director of Ford, was required to, but failed to: (1) implement and maintain an effective system of internal controls over financial reporting to ensure that the Company's financial statements were accurate and complete; (2) implement and maintain an effective system of internal controls and corporate governance practices and procedures to monitor the material risks posed to the Company, its stockholders, and customers; and (3) investigate and take action when presented with red flags evidencing that the Company had issued false and misleading financial statements.   Had Weinberg taken timely action the damage caused to Ford could have been prevented or at least minimized.

221.   Weinberg, as a member of the Nominating and Governance Committee, had duties to ensure the implementation and effectiveness of Ford's Code of Conduct and Corporate Governance Principles. Weinberg utterly failed to perform these essential duties.

222.   Weinberg is neither disinterested nor independent.   Any demand upon Defendant Weinberg is futile and, thus, excused.

### O.   Demand Upon Defendant Lawler Is Excused

223.   Defendant Lawler is the CFO of Ford since October 2020 and a director since July 2024. Lawler is not independent. As an employee of Ford, the Company provides Lawler with his principal occupation from which he receives substantial compensation. In 2023, Farley received a total compensation package exceeding $10 million.

224.   Lawler is beholden to Defendants English, Henry Ford, and Bill Ford, who are controlling shareholders of Ford and who have arranged to profit from related party transactions with the Company that Lawler has approved. As such, Lawler will not act against Defendants English, Henry Ford, and Bill Ford given their positions as controlling shareholders which enable them to control Ford's management and affairs, and most matters requiring stockholder approval.

225.   Lawler had a powerful incentive to inflate Ford's stock price through false and misleading financial information in order to profit from insider sales. Lawler sold 29,821 Ford shares while in possession of material adverse non-public information, reaping proceeds of nearly $400,000. Thus, through the Individual Defendants' material omissions and misrepresentations to the market about Ford's financial condition, Lawler reaped a material personal benefit not shared with other Ford stockholders from the misconduct pled herein.

226.  Lawler had a powerful incentive to inflate Ford's stock price through false and misleading financial information in order to profit from his award of 135,635 RSUs under the 2023 LTIP. Thus, through the Individual Defendants' material omissions and misrepresentations to the market about Ford's financial condition, Lawler reaped a material personal benefit not shared with other Ford stockholders from the misconduct pled herein.

227.  In addition to lacking disinterest due to his receipt of material personal benefits as a result of the misconduct challenged herein, Lawler faces a substantial likelihood of liability because he traded on material, nonpublic information and because he disseminated false and misleading financial information to the market.

228.  Lawler is named as a defendant in the pending Securities Class Action. As such, he is incapable of considering a demand to commence and vigorously prosecute this action with the required independence and disinterest.

229.  Lawler, as CFO of Ford, was required to, but failed to: (1) implement and maintain an effective system of internal controls over financial reporting to ensure that the Company's financial statements were accurate and complete; (2) implement and maintain an effective system of internal controls and corporate governance practices and procedures to monitor the material risks posed to the Company, its stockholders, and customers; and (3) investigate and take action when presented with red flags evidencing that the Company had issued false and

misleading financial statements. Had Lawler taken timely action the damage caused to Ford could have been prevented or at least minimized.

230. Lawler is neither disinterested nor independent. Any demand upon Defendant Lawler is futile and, thus, excused.

### P. Other Factors Demonstrating That Demand Upon The Individual Defendants Is Futile

231. Ford has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Board has not caused the Company to take action to recover for the Company the damages it has suffered and will continue to suffer thereby.

232. The members of the Board received, and continue to receive, substantial salaries, bonuses, payments, benefits, and other emoluments by virtue of their membership on the Board. They have thus benefited from the wrongs alleged herein and have engaged therein to preserve their positions of control and the perquisites thereof and are incapable of exercising independent objective judgment in deciding whether to bring this action.

233. Publicly traded companies, such as Ford, typically carry director & officer liability insurance from which the Company could potentially recover some or all its losses. However, such insurance typically contains an "insured vs. insured" disclaimer that will foreclose a recovery from the insurers if the Individual Defendants sue each other to recover Ford's damages.

## VII.  CLAIMS FOR RELIEF

### FIRST CLAIM
### Against the Individual Defendants (Except Lawler) For
### Violations of Section 14(a) of the Exchange Act

234.  Plaintiffs incorporate by reference and reallege each and every allegation set forth above as if fully set forth herein.

235.  The Section 14(a) claim alleged herein is based solely on negligence.  It is not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants.  Section 14(a) claim alleged herein does not allege and does not sound in fraud. Plaintiffs specifically disclaim any allegations of reliance upon any allegation of, or reference to, any allegation of fraud, scienter, or recklessness with regard to those non-fraud claims.

236.  Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

237.  Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

238.  Under the direction of the Individual Defendants (except Lawler), the 2023 and 2024 Proxy Statements failed to disclose that the Individual Defendants each violated their fiduciary duties to Ford and its stockholders by, among other things, failing to: (1) implement and maintain an effective system of internal controls to ensure that the Company was complying with all laws, rules, and regulations governing Ford's core operations and making truthful, accurate, and complete statements regarding its core operations, financial condition, and business prospects; (2) effectively oversee and monitor the material risks facing the Company; and (3) investigate and take action when presented with red flags regarding misconduct or the lack of internal controls.  Further, the 2023 and 2024 Proxy Statements contained false and misleading statements related to risk and corporate governance oversight by the Board and the Audit Committee.

239.  In the exercise of reasonable care, the Individual Defendants (except Lawler) should have known that by misrepresenting or failing to disclose the

foregoing material facts, the statements contained in the 2023 and 2024 Proxy Statements were materially false and misleading and omitted material information.

240.  The false and misleading statements in, and information omitted from, the 2023 and 2024 Proxy Statements was material to Ford's shareholders in determining whether to, among other things, elect Defendants Casiano, English, Farley, Henry Ford, Bill Ford, Helman, Huntsman, Kennard, May, Mooney, Radakovich, Thornton, Veihmeyer, and Weinberg to the Board and to approve compensation.

241.  The material misstatements and omissions in the 2023 and 2024 Proxy Statements damaged the Company.

242.  Plaintiffs, on behalf of Ford, seek relief for damages inflicted upon the Company based on the misleading 2023 and 2024 Proxy Statements in connection with the improper election of Defendants Casiano, English, Farley, Henry Ford, Bill Ford, Helman, Huntsman, Kennard, May, Mooney, Radakovich, Thornton, Veihmeyer, and Weinberg and the approval of compensation.

## SECOND CLAIM
### Against the Individual Defendants for
### Violations of Section 10(b) and Rule 10b-5 of the Exchange Act

243.  Plaintiffs incorporate by reference and reallege each and every allegation set forth above as if fully set forth herein.

244.   This Count is asserted on behalf of the Company against the Individual Defendants for violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

245.   At all relevant times, in connection with Ford's repurchases of its shares, the Individual Defendants made, disseminated, or approved false and misleading statements about the Company, omitting material information specified herein, which they knew or deliberately disregarded as false, misleading, or incomplete, intending to deceive, manipulate, or defraud. These false, misleading, or incomplete statements and Defendants' course of conduct were designed to artificially inflate the price of the Company's common stock.

246.   At the same time that the price of the Company's common stock was inflated due to the false, misleading, or incomplete statements, Defendants caused the Company to repurchase millions of shares of its stock at prices artificially inflated by those statements. They engaged in a scheme to defraud the Company by causing it to repurchase shares at inflated prices.

247.   The Individual Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 by (a) employing devices, schemes, and artifices to defraud; (b) making untrue statements of material facts or omitting material facts necessary to make the statements not misleading, given the circumstances; and/or (c) engaging in

acts, practices, and a course of business that operated as a fraud or deceit upon the Company in connection with its purchases of Ford common stock.

248. The Individual Defendants, directly and indirectly, used means or instrumentalities of interstate commerce and/or the U.S. mails, participating in a continuous course of conduct that operated as a fraud and deceit upon the Company. They made or disseminated various false and/or misleading statements of material facts and omitted material facts necessary to make their statements not misleading, acted with intentional or reckless disregard for the truth, and employed devices and artifices to defraud in connection with the Company's purchase of Ford common stock, deceiving the Company regarding its performance and internal controls.

249. As directors and officers, the Individual Defendants were directly responsible for and are liable for all materially false, misleading, or incomplete statements made during the relevant times.

250. The Individual Defendants acted with *scienter*, either intending to deceive, manipulate, or defraud, or with severe recklessness. The misstatements and omissions of material facts set forth herein were either known to Defendants or were so significant that they should have been aware of them.

251. As a result of the Individual Defendants' misconduct, Ford suffered damages by paying artificially inflated prices for Ford common stock and incurred losses when the true facts became known. The Company would not have purchased

Ford common stock at the prices it paid, or at all, but for the artificial inflation caused by the Individual Defendants' false, misleading, or incomplete statements.

252. As a direct and proximate result of the Individual Defendants' wrongful conduct, the Company suffered damages related to its repurchases of Ford common stock during the time period alleged. Therefore, the Individual Defendants are liable to the Company pursuant to Section 10(b) of the Exchange Act and SEC Rule 10b-5.

253. Plaintiffs bring this claim within two years of discovering the facts constituting the violation and within five years of the violation.

## THIRD CLAIM
### Against Defendants Farley and Lawler for Contribution
### Under Section 21D of the Exchange Act

254. Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

255. The Company and Defendants Farley and Lawler are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 10(b) and 21D of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendants Farley's and

Lawler's willful and/or reckless violations of his obligations as an officer and director of the Company.

256.  Defendants Farley and Lawler, because of their positions of control and authority, was able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of the Company, including the wrongful acts complained of herein and in the Securities Class Action.

257.  Accordingly, Defendants Farley and Lawler are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

258.  As such, the Company is entitled to receive all appropriate contribution or indemnification from Defendants Farley and Lawler.

## FOURTH CLAIM
### Against the Individual Defendants for Breach of Fiduciary Duty

259.  Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

260.  The Individual Defendants owed and owe fiduciary duties to Ford.  By reason of their fiduciary relationships, the Individual Defendants specifically owed and owe Ford the highest obligation of good faith and loyalty in the administration of Ford's affairs.  The Board also had specific fiduciary duties as defined by the Company's corporate governance documents and principles that, had they been

discharged in accordance with the Board's obligations, would have prevented the misconduct and consequential harm to Ford alleged herein.

261.  The Individual Defendants ignored their obligations under state and federal law. The Individual Defendants failed to make a good faith effort to correct the problems or prevent their occurrence.

262.  The Individual Defendants, by their actions and by engaging in the wrongdoing described herein, abandoned and abdicated their responsibilities and duties regarding prudently managing the business of Ford in a manner consistent with the duties imposed upon them by law.

263.  By committing the misconduct alleged herein, the Individual Defendants breached their duties of good faith and loyalty in the management and administration of Ford's affairs and in the use and preservation of Ford's assets.

264.  As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, Ford has sustained significant damages, not only monetarily, but also to its corporate image and goodwill. Such damages include, among other things, the costs of defending and resolving the pending Securities Class Action.

265.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

## FIFTH CLAIM
### Against The Individual Defendants For Aiding And Abetting

266. Plaintiffs incorporate by reference and reallege each and every allegation set forth above as if fully set forth herein.

267. Each of the Individual Defendants has acted and is acting with knowledge of or with reckless, or grossly negligent, disregard to the fact that the Individual Defendants are in breach of their duties to the Company and have participated in such breaches of duties.

268. In committing the wrongful acts, each of the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct. They have acted in concert with and conspired with one another in furtherance of their common plan or design. In addition to pursuing the wrongful conduct that gives rise to their primary liability, the Individual Defendants also aided and abetted, and/or assisted, each other in breaching their respective duties.

269. Because the actions described herein occurred under the Board's supervision and authority, each of the Individual Defendants played a direct, necessary, and substantial part in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

270. Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.

## SIXTH CLAIM
### Derivative *Brophy* Claim Against The Insider Seller Defendants

271.  Plaintiffs incorporate by reference and reallege each and every allegation set forth above as if fully set forth herein.

272.  As directors and officers of Ford, the Insider Seller Defendants owed fiduciary duties of loyalty and good faith to the Company.

273.  The Insider Seller Defendants sold Ford stock while in possession of material nonpublic information that artificially inflated the price of Ford stock.

274.  By selling Ford stock while in the possession of material adverse nonpublic information that artificially inflated the price of Ford stock, the Insider Seller Defendants exploited their positions at Ford  and breached their  fiduciary duties to Ford. The Insider Seller Defendants improperly benefited from their breaches of fiduciary duty and are liable to Ford for their benefit therefrom.

275.  Plaintiffs, on behalf of Ford, have no adequate remedy at law.

## VIII.  PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs demand judgment in the Company's favor against all Individual Defendants as follows:

(a)    Declaring that Plaintiffs may maintain this action on behalf of Ford, and that Plaintiffs is an adequate representative of the Company;

(b)    Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Ford;

(c)     Declaring that the Individual Defendants violated Sections 14(a) and 21D of the Exchange Act;

(d)     Determining and awarding to Ford the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(e)     Directing Ford to take all necessary action to reform and improve its compliance, internal control systems and corporate governance practices and procedures to protect the Company and its stockholders from a repeat of the damaging events described herein;

(f)     Ordering the Insider Seller Defendants to disgorge and pay to the Company all profits, benefits, and other compensation obtained by their insider trading and breaches of fiduciary duties;

(g)     Ordering disgorgement of profits, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties;

(h)     Awarding to the Company restitution from Defendants, and each of them;

(i)     Awarding to Plaintiffs the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

(j)     Granting such other and further relief as the Court deems just and proper.

## IX.   JURY DEMAND

Plaintiffs hereby demand a trial by jury.

Dated: January 13, 2025

By:   */s/ E. Powell Miller*
E. Powell Miller (P39487)
Dennis A. Lienhardt (P81118)
**THE MILLER LAW FIRM, P.C.**
950 West University Drive
Rochester, MI 48307
Telephone: (248) 841-2200
Email: epm@millerlawpc.com
        dal@millerlawpc.com

**WEISS LAW**
David C. Katz
Mark D. Smilow
305 Broadway, 7th Fl.
New York, NY 10007
Telephone: (212) 682-3025
Facsimile: (212) 682-3010
Email: dkatz@weisslawllp.com
        msmilow@weisslawllp.com

Joshua M. Rubin
Jonathan Meer
4 Brighton Rd., Ste. 204
Clifton, NJ 07014
Email: jrubin@weisslawllp.com

jmeer@weisslawllp.com

***Counsel for Plaintiffs***